**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
The Honorable Michael E. Romero

| | |
|---|---|
| In re:<br><br>The Aspen Chapel, a Colorado Non-Profit Organization,<br><br>Debtor. | Case No. 22-11531 MER<br><br>Chapter 11 |

**ORDER DENYING APPROVAL OF DISCLOSURE STATEMENT**
**BECAUSE THE AMENDED PLAN IS UNCONFIRMABLE**

THIS MATTER is before the Court on the Corrected Third Amended Disclosure Statement ("**Disclosure Statement**") and associated Third Amended Plan of Reorganization ("**Amended Plan**") filed by the Debtor and the objection to approval of the Disclosure Statement filed by the Aspen Jewish Congregation ("**AJC**").[1] The parties agree the Disclosure Statement provides adequate information for approval under 11 U.S.C. § 1125(b).[2] Nevertheless, the AJC argues the Court should deny confirmation prior to solicitation of votes because the Amended Plan is patently unconfirmable.

## BACKGROUND

This is the Debtor's second attempt to approve a disclosure statement and confirm a plan. By order dated July 30, 2025 (the "**July 30 Order**"), the Court denied confirmation of the Debtor's initial proposed plan ("**First Plan**").[3] In both the First Plan and the Amended Plan, the primary issue is a 99-year lease agreement between the Debtor and the AJC, executed in 1989 (the "**1989 Agreement**"), for a chapel building owned by the Debtor. The July 30 Order, which is incorporated by reference, lays out a detailed history and description of the 1989 Agreement and the parties' relationship, which the Court will not repeat here. Suffice it to say that the 1989 Agreement is not a typical commercial lease. It does not grant the AJC exclusive use of the chapel or specify the rent owed. Instead, it contemplates the AJC will share occupancy with other users and will pay a portion of the chapel's "maintenance and operation costs," which are neither defined nor quantified. The Agreement suggests the parties will fundraise to

---

[1] ECF Nos. 358, 359, 373 and 380.

[2] All references to "section" or "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

[3] ECF No. 355. The Debtor has filed a total of five plans (ECF Nos. 184, 187, 252, 286, 358). The July 30 Order denied confirmation of the Debtor's Second Amended Plan, ECF No. 286.

pay for current and future "repairs and replacements". Still, it provides no specific amounts, deadlines, or other details regarding how this will be accomplished.  The Agreement lacks other standard provisions typically found in a commercial lease, including a default provision and provisions governing modification of the Agreement.

The vague nature of the 1989 Agreement ultimately gave rise to disputes and prepetition litigation between the Debtor and the AJC concerning the amounts the AJC owes for its use of the chapel.  After filing bankruptcy, one of the Debtor's first actions was to reject the 1989 Agreement under 11 U.S.C. § 365(h).[4]  This did not terminate the Agreement, only ended the Debtor's obligations thereunder.  The AJC elected, pursuant to § 365(h)(1)(A)(ii), to continue its occupancy of the chapel.  As provided in § 365(h), the AJC is entitled to retain its rights under the 1989 Agreement, "including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment . . . that are in or appurtenant to the real property for the balance of the term of such lease."[5]

This means the Debtor's rejection of the 1989 Agreement did little to solve the parties' ongoing disagreements.  The AJC still has rights as a tenant under the 1989 Agreement, but the exact parameters of those rights remain as much in dispute as before rejection.  The Debtor's proposed solution to this dilemma is to provide the missing terms of the 1989 Agreement through a plan.  In the First Plan, the Debtor set forth numerous terms that would control the parties' landlord-tenant relationship in the future.  Where the 1989 Agreement lacked specific details regarding use and amounts owed, the First plan specified how and when the AJC could use the chapel, set specific payment obligations, and added other standard lease terms, including a default provision.

There were two significant problems with this approach.  First, as outlined in the July 30 Order, the terms specified in the First Plan made substantial changes to the AJC's usage rights and payment obligations under the 1989 Agreement, thus violating § 365(h).  The Debtor argued its First Plan merely documented terms previously established by the parties' course of performance over the last thirty-six years.  However, this Court disagreed, concluding that the course of performance largely failed to establish clear terms and that the First Plan further diminished the sparse clarity that may have existed.  Because the First Plan violated § 365(h), the Court concluded it was unconfirmable under § 1129(a)(1), which requires a plan to comply with all provisions of the Bankruptcy Code.

Second, the Court concluded the Debtor had not proposed the First Plan in good faith because it did not serve a legitimate bankruptcy purpose. Instead, the Court concluded the primary reason the Debtor filed this case and proposed its First Plan was to reject the 1989 Agreement under § 365(h) and force new lease terms on the AJC.

---

[4] ECF Nos. 25, 60.

[5] 11 U.S.C. § 365(h)(1)(A)(ii).

The Court's July 30 Order concluded the Debtor acted in bad faith by using its First Plan as a contract negotiation tool to force new and altered lease terms on the AJC.

With its Amended Plan, the Debtor argues it has rectified these issues. The Amended Plan includes lease terms the Debtor contends align with the Court's findings in the July 30 Order. The Debtor asserts this Court need not hold another evidentiary hearing on confirmation and can rule on confirmation of the Amended Plan based on evidence already admitted at the evidentiary hearing on the First Plan. The AJC contends the same problems remain and that the Amended Plan is patently unconfirmable and should be denied at the disclosure statement stage.

## ANALYSIS

Section 1125 of the Code governs the approval of disclosure statements. Typically, approval involves consideration of whether a proposed disclosure statement provides "adequate information" for parties in interest to allow for solicitation of votes on the plan. Confirmation-related issues are usually reserved for the confirmation hearing. However, many courts have recognized that "if it appears that there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."[6] "A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing'."[7]

Here, the question is whether Debtor's Amended Plan is sufficiently different from the First Plan to make confirmation possible. A comparison of the First Plan and Amended Plan shows the Debtor changed or eliminated some of the lease terms the Court identified as altering the AJC's existing leasehold rights in violation of § 365(h). For example, the Debtor deleted the requirement that the AJC make monthly contributions to a reserve fund for future capital repairs. Other terms, such as the number of Friday nights the AJC is permitted to use the chapel, are modified in the Amended Plan but not eliminated.

The AJC argues that, even with the changes, the Amended Plan still alters its lease rights in violation of § 365(h). The Court agrees. The most obvious relates to the AJC's payment obligations. As detailed in the July 30 Order, the 1989 Agreement sets no specific payment terms for "maintenance and operation costs" or "repairs and replacements." The parties' course of performance with respect to these amounts changed over time and ultimately lacks clarity. On several occasions, the AJC refused

---

[6] *In re American Capital Equipment, LLC*, 688 F.3d 145. 154 (3d Cir. 2012) (citing *In re Larsen*, 2011 WL 1671538, at *2 n. 7 (Bankr. D. Idaho May 3, 2011)); *In re K Lunde, LLC*, 513 B.R. 587, 590 (Bankr. D. Colo. 2014).

[7] *In re K Lunde, LLC*, 513 B.R. at 590 (quoting *In re American Capital Equipment, LLC*, 688 F.3d 145. 154-55 (3d Cir. 2012) (internal quotations and alterations omitted).

to pay expenses it deemed questionable; the parties' failure to set forth clear terms resulted in litigation.

The Amended Plan alters this status quo by providing clear-cut payment terms favorable to the Debtor. It requires the AJC to pay its share of maintenance and operating expenses as set by the Debtor's board in the Debtor's annual budget. It also requires the AJC to pay a portion of repair and replacement costs the Debtor elects to perform. The Amended Plan says the AJC will be able to give "input and comment" on the Debtor's budget and review bids on repairs, but it is clear the Debtor has ultimate authority for setting these amounts regardless of the AJC's views. While this resolution has some practical appeal, it nevertheless violates § 365(h) by altering the payment terms under the 1989 Agreement. There are similar issues with the Amended Plan's terms regulating the AJC's use of the chapel. The Amended Plan places specific limits on the AJC's usage rights that are not contained in the 1989 Agreement nor clearly established by the parties' course of performance.

These violations of § 365(h) demonstrate that, as with the First Plan, the Debtor did not propose the Amended Plan in good faith. As discussed in detail in the July 30 Order, § 1129(a)(3) requires the Amended Plan to be "proposed in good faith and not by any means forbidden by law."[8] The Bankruptcy Code does not define "good faith." Instead, courts look at whether "there is a reasonable likelihood that the plan will achieve its intended results, which are consistent with the purpose of the Bankruptcy Code, that is, the plan is feasible, practical, and would enable the company to continue to pay its debts in accordance with the plan provisions."[9] In making a good-faith determination, courts consider several factors, including whether the debtor intended to abuse the judicial process, the purpose of the reorganization, the debtor's post-petition conduct, and the terms of the plan itself.[10] Good faith is evaluated on a case-by-case basis and is based on the totality of the circumstances.[11]

This is a somewhat unusual Chapter 11 case because the Debtor is solvent and has relatively few debts. Although there is no insolvency requirement for filing bankruptcy, the lack of an insolvency requirement "does not mean that all solvent firms should have unfettered access to Chapter 11."[12] Instead, a solvent debtor must still demonstrate some "financial distress" that necessitates a Chapter 11 filing.[13] If a debtor

---

[8] 11 U.S.C. § 1129(a)(3).

[9] *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1459 (10th Cir. 1985); *Search Mkt. Direct Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1178-79 (10th Cir. 2012); *In re 303 Invs., Inc.*, 662 B.R. 1, 9-10 (Bankr. D. Colo. 2024).

[10] *In re Pikes Peak Water Co.*, 779 F.2d at 1460; *In re Paige*, 685 F.3d at 1179.

[11] *In re 303 Invs., Inc.*, 662 B.R. at 10.

[12] *In re Integrated Telecom Express, Inc.,* 384 F.3d at 122.

[13] *In re Integrated Telecom Express, Inc.,* 384 F.3d at 122; *In re Roman Catholic Church of Archdiocese of New Orleans*, 632 B.R. 593, 602 (Bankr. E.D. La. 2021).

does not need to rehabilitate or reorganize, its plan cannot serve "the rehabilitative purpose for which Chapter 11 was designed."[14]

The July 30 Order determined the Debtor was not suffering from the sort of financial distress that a bankruptcy plan could remedy. The Debtor has no secured debt, and there are no liens on the chapel. The Debtor's prepetition unsecured debts are relatively minimal, and a significant portion of those debts is owed to creditors who previously agreed to delay repayment until the Debtor has sufficient funds and all other creditors have been paid in full. The Debtor's income from monthly "rent" payments by the AJC and the chapel's other tenant, the Aspen Chapel Congregation ("**ACC**"), remains steady. The Debtor also anticipates being able to sell its transferable development rights or "**TDRs**" for over $2.2 million. These funds could easily pay the prepetition debts. The Debtor faces no imminent threat of liquidation, nor does it need a plan to maximize assets to pay prepetition debts.

In both Plans, the Debtor identifies costly deferred repairs to the chapel and attaches an estimate of the costs. Even assuming these repairs will cost as much as the Debtor estimates, the $2.2 million in TDR funds and the fundraising the Debtor anticipates receiving will readily cover those costs. Deferred repairs the Debtor can afford to pay do not represent the type of "financial distress" the Code was designed to address. The same is true of the Debtor's new business plan, pursuant to which the Debtor hopes to modernize the chapel, attract new business, and otherwise increase its revenues and save funds for the future. While these are all sensible goals, they do not constitute financial distress that would necessitate a Chapter 11 reorganization plan.

What the Debtor needs is not a plan of reorganization but a new lease with the AJC that has defined payment obligations and use restrictions for the AJC. The primary reason Debtor filed this bankruptcy case, and its Amended Plan is to accomplish this goal. The one thing the Debtor did not accomplish outside of bankruptcy, and the primary reason it filed this case and the Plan, is to reject the 1989 Agreement under § 365(h) and implement new lease terms for the AJC.

Debtors frequently file for bankruptcy to take advantage of specific sections of the Bankruptcy Code. It is not necessarily bad faith for a debtor to do so.[15] Nor is it bad faith for a plan to modify a claim in a manner the Bankruptcy Code allows.[16] On the other hand, a debtor's desire to take advantage of a particular provision in the

---

[14] *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999); *In re Integrated Telecom Express, Inc.,* 384 F.3d at 122 ("Courts, therefore, have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11.").

[15] *Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2003) (concluding it was not bad faith for a debtor to file bankruptcy to take advantage of the cap on lease rejection damages in § 502(b)(6)).

[16] *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 29 (Bankr. D. Kan. 2001) ("There simply can be no bad faith in a plan that proposes to modify a claim in the way that the Bankruptcy Code allows").

Bankruptcy Code, standing alone, does not establish *good* faith.[17] Instead, to be filed in good faith, a debtor "must do more than merely invoke some distributional mechanism in the Bankruptcy Code" and demonstrate it "seek[s] to create or preserve some value that would otherwise be lost . . . outside of bankruptcy."[18] In other words, a debtor must show its plan serves a legitimate bankruptcy purpose beyond the mere desire to invoke a particular provision of the Code. To hold otherwise would "eviscerate" the good faith limitation because *every* bankruptcy filing is to obtain relief under some provision of the Bankruptcy Code.[19]

Thus, the Debtor's invocation of § 365(h) to reject the 1989 Agreement does not establish either good or bad faith. What is relevant is the Debtor's filing of an Amended Plan that forces altered lease terms onto the AJC in violation of § 365(h). Misuse of the Code's reorganization powers demonstrates a lack of good faith.[20] The Debtor has not otherwise shown that its Amended Plan serves the purposes of the Bankruptcy Code. The Debtor is solvent and can otherwise pay its debts and implement its new business plan outside of bankruptcy. These facts, combined, establish that the Debtor did not propose the Amended Plan in good faith in violation of § 1123(a)(3).

## CONCLUSION

Accordingly, for the foregoing reasons, it is hereby ORDERED that approval of the Disclosure Statement and confirmation of the Amended Plan are DENIED. On or before **January 29, 2026**, the Debtor shall file either a status report indicating how it intends to move forward with this case or a motion to dismiss.

Dated: January 15, 2026.                    BY THE COURT:

Michael E. Romero, Judge
United States Bankruptcy Court

---

[17] *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 127 (3d Cir. 2004).

[18] *Id*. at 129.

[19] *Id*. at 127-28.

[20] *See In re SGL Carbon Corp.*, 200 F.3d at 165 (noting Chapter 11 vests debtors with considerable powers the exercise of which is justified if the debtor is financial troubled, but not so "when a petitioner's aims lie outside those of the Bankruptcy Code.").